# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 21, 2013

No. 11-50932

Lyle W. Cayce
Clerk

DEPARTMENT OF TEXAS, Veterans of Foreign Wars of the United States; AMVETS DEPARTMENT OF TEXAS, INCORPORATED; AMVETS POST 52, INCORPORATED; AMVETS POST 52, AUXILIARY, INCORPORATED; THE GREAT COUNCIL OF TEXAS, Improved Order of Redmen; REDMEN WAR EAGLE TRIBE NO. 17; REDMEN TRIBE NO. 21 GERONIMO; REDMEN RAMONA COUNCIL NO. 5; THE INSTITUTE FOR DISABILITY ACCESS, INCORPORATED, doing business as Adapt of Texas; TEMPLE ELKS LODGE NO. 138, Benevolent and Protective Order of Elks of The United States of America, Incorporated; BRYAN LODGE NO. 859, Benevolent and Protective Order of Elks of The United States of America, Incorporated; AUSTIN LODGE NO. 201, Benevolent and Protective Order of Elks of The United States of America, Incorporated; ANNA FIRE AND RESCUE, INCORPORATED,

Plaintiffs - Appellees

v.

TEXAS LOTTERY COMMISSION; GARY GRIEF, Executive Director in His Official Capacity; SANDRA K. JOSEPH, Director of Charitable Bingo in Her Official Capacity; MARY ANN WILLIAMSON, Commissioner in Her Official Capacity; COMMISSIONER IN OFFICIAL CAPACITY; J. WINSTON KRAUSE, Commissioner in His Official Capacity,

Defendants - Appellants

Appeal from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, DeMOSS and GRAVES, Circuit Judges.

No. 11-50932

PER CURIAM:

The original opinion in this appeal was issued by a unanimous panel on October 9, 2012. On November 21, 2012, we granted Appellees' petition for panel rehearing without hearing oral argument. We now withdraw our previous opinion and substitute the following.

The question presented in this appeal is whether Texas's charitable bingo program violates the First Amendment by allowing charitable organizations to raise money by holding bingo games on the condition that the money is used only for the organizations' charitable purpose, as defined by the Texas Bingo Enabling Act. The Act specifically prohibits the use of bingo proceeds for certain types of political advocacy, including lobbying and supporting or opposing ballot measures. Plaintiffs-appellees, a group of charitable organizations licensed to conduct bingo games, filed suit challenging those political advocacy restrictions, arguing they violate their speech rights under the First Amendment. The district court granted summary judgment in favor of Appellees and issued a permanent injunction preventing enforcement of the challenged provisions. We reverse for the following reasons.

## BACKGROUND

The Texas Constitution has prohibited gambling for most of the State's history. *See* Tex. Const. of 1845, art. VII, § 17 ("No lottery shall be authorized by this State; and the buying or selling of lottery tickets within this State is prohibited."); *see also* Tex. Const. art. III, § 47 (amended 1980) ("The legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other States."); *Hardy v. State*, 102 S.W.3d 123, 130 (Tex. 2003). In November 1980, Texas voters approved an amendment to the Texas Constitution establishing an exception to the general ban on gambling for charitable bingo. The exception

No. 11-50932

allows the Texas Legislature to "authorize and regulate bingo games conducted by a church, synagogue, religious society, volunteer fire department, nonprofit veterans organization, fraternal organization, or nonprofit organization supporting medical research or treatment programs." Tex. Const. art. III, § 47(b). The constitution makes clear that the bingo exception was established for the limited purpose of supporting the enumerated charitable organizations, requiring that "all proceeds from the [bingo] games are spent in Texas for charitable purposes of the organizations." *Id.* § 47(b)(1).

To implement the charitable bingo exception, the Texas Legislature passed the Bingo Enabling Act ("Bingo Act") in 1981. Bingo Enabling Act, 67th Leg., 1st C.S., ch. 11, 1981 Tex. Gen. Laws 85 (current version at TEX. OCC. CODE § 2001.001 et seq. (2012)). The Bingo Act sets forth the rules that govern the State's charitable bingo program and establishes a licensing scheme under which eligible charitable organizations can obtain a license to hold bingo games. The Act includes the Texas Constitution's requirement that bingo proceeds are used only for an organization's "charitable purposes," and specifies that bingo proceeds may not be used for lobbying activities or to support or oppose ballot measures ("political advocacy"). *See* TEX. OCC. CODE §§ 2001.454, .456. This appeal centers on the political advocacy restrictions, which provide as follows:

> A licensed authorized organization may not use the net proceeds from bingo directly or indirectly to:
>
> (1) support or oppose a candidate or slate of candidates for public office;
>
> (2) support or oppose a measure submitted to a vote of the people; or
>
> (3) influence or attempt to influence legislation.

*Id.* § 2001.456.

3

No. 11-50932

Appellees, thirteen nonprofit organizations licensed to hold bingo games ("Charities"), have challenged the second and third of the above provisions, § 2001.456(2)–(3), arguing they violate their First Amendment right to free speech. They do not challenge the prohibition on using bingo funds to support or oppose political candidates or the requirement that bingo proceeds are used only for an organization's charitable purposes. The lead plaintiffs are the Department of Texas Veterans of Foreign Wars ("VFW") and the Institute for Disability Access, d/b/a ADAPT of Texas ("ADAPT"). Both VFW and ADAPT engage in political advocacy in furtherance of their charitable mission. They maintain that bingo generates a substantial portion of their total revenue and that the challenged statutory provisions restrict their ability "to engage in political advocacy to the degree that, in the judgment of [their] governing bod[ies], would best further [their] purposes."

The Charities filed suit on June 25, 2010 in the Western District of Texas naming as defendants, in their official capacities, the commissioners and two executive officers of the Texas Lottery Commission (collectively the "Commission").[1] The Charities asserted claims under 42 U.S.C. § 1983 arguing that the challenged provisions are facially invalid under the First Amendment because they restrict political speech and fail to satisfy strict scrutiny. They also alleged that the provisions impermissibly restrict speech on the basis of the speaker's identity because they apply to nonprofit organizations and not for-profit gaming organizations. The Charities sought temporary and permanent injunctions preventing enforcement of the challenged provisions, a declaration that the provisions are unconstitutional, and attorneys' fees.

On October 29, 2010, the district court issued a preliminary injunction preventing enforcement of § 2001.456(2)–(3). The court, drawing heavily from

---

[1] The Texas Lottery commission was originally named as a defendant, but was dismissed from the suit by the district court on the basis of Eleventh Amendment immunity.

4

the Supreme Court's opinion in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), concluded that the challenged provisions are facially unconstitutional under the First Amendment because they burden political speech and fail to satisfy strict scrutiny. Shortly after the district court issued its opinion, the Commission filed an interlocutory appeal in this court. The Commission also filed motions to stay the preliminary injunction in the district court and in this court, both of which were denied.

While the interlocutory appeal was pending, the Charities moved for summary judgment. On August 30, 2011, the district court issued an opinion granting the Charities' motion for summary judgment for the reasons stated in the opinion granting the preliminary injunction. That same day the district court entered a final judgment permanently enjoining enforcement of the challenged provisions and declaring them unconstitutional. The interlocutory appeal was dismissed as moot and the Commission timely filed a new appeal challenging the permanent injunction.

## STANDARD OF REVIEW

This court reviews the grant of summary judgment de novo, applying the same standard used by the district court. *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 233 (5th Cir. 2009). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## DISCUSSION

### A. Standing

Before reaching the merits of this appeal, we must first address the Commission's argument that the Charities lack Article III standing because their claims are not redressable.

No. 11-50932

Constitutional standing is a jurisdictional question which we review de novo. *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011). To establish Article III standing, a plaintiff must show "an injury-in-fact caused by a defendant's challenged conduct that is redressable by a court." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010). For a plaintiff's claim to be redressable, it must be "likely, as opposed to merely speculative, that a favorable decision will redress the plaintiff's injury." *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 788 (5th Cir. 2001). "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *LeBlanc*, 627 F.3d at 123 (alteration in original) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

The Commission argues that the Charities' claims are not redressable because the relief they seek—the ability to use bingo proceeds for political advocacy—is independently foreclosed by the requirement in the Texas Constitution and the Bingo Act that bingo proceeds be used only for an organization's charitable purpose. *See* Tex. Const. art. III, § 47(b)(1); TEX. OCC. CODE § 2001.454. According to the Commission, even if we enjoin enforcement of the political advocacy restrictions, the charitable purpose requirement, which the Charities have not challenged, would still prohibit the Charities from using bingo proceeds for lobbying or to support or oppose ballot measures. As support, the Commission argues: (1) that by enacting the challenged political advocacy restrictions, the legislature made clear that an organization's charitable purpose cannot include political advocacy, and (2) that the Commission's interpretation of the charitable purpose requirement is reasonable and entitled to deference.

We agree that the Bingo Act makes clear that an organization's charitable purpose cannot include lobbying or supporting or opposing ballot measures, at least for purposes of the State's charitable bingo program. The Act provides that

No. 11-50932

bingo proceeds may be spent only on an organization's charitable purposes, § 2001.454, and then specifically prohibits the use of bingo proceeds for political advocacy, § 2001.456. Clearly, political advocacy is not a charitable purpose for which bingo proceeds can be used under the Act.[2]

However, the Commission's standing argument requires that we interpret the charitable purpose requirement as containing an independent prohibition on the use of bingo proceeds for political advocacy, in addition to the prohibition in § 2001.456 challenged by the Charities. While the term "charitable purpose" is not defined in the Texas Constitution, it is defined in the Bingo Act. *See Owens v. State*, 19 S.W.3d 480, 484 (Tex. App.—Amarillo 2000, no pet.) ("The [Texas] Legislature may define terms which are not defined in the Constitution itself . . . ."). We interpret Texas statutes the way we believe the Texas Supreme Court would do so. *See United States v. Escalante*, 239 F.3d 678, 681 n.12 (5th Cir. 2001); *see also Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 508 n.72 (5th Cir. 2001). The Bingo Act defines "charitable purpose" as follows:

> Except as otherwise provided by law, the net proceeds derived from bingo and any rental of premises are dedicated to the charitable purposes of the organization only if directed to a cause, deed, or activity that is consistent with the federal tax exemption the organization obtained under 26 U.S.C. Section 501 and under which

---

[2] As originally passed in 1981, the Bingo Act's requirements that bingo proceeds be used for an organization's charitable purpose and not for political advocacy are located one after another in the same subsection, suggesting that the latter was merely a clarification of the former: "The net proceeds of any game of bingo and of any rental of premises for bingo shall be exclusively devoted to the charitable purposes of the organization permitted to conduct the game. The proceeds of any game of bingo or of any rental may not be used to support or oppose a particular candidate or a slate of candidates for public office or in favor of or in opposition to any measure submitted to a vote of the people." Bingo Enabling Act, 67th Leg., 1st C.S., ch. 11, § 11(d), 1981 Tex. Gen. Laws 85, 90. The prohibition on using bingo proceeds for lobbying was added by amendment in 1983. Act of May 25, 1983, 68th Leg., R.S., ch. 575, § 19a(h), 1983 Tex. Gen. Laws 3443, 3470–71.

7

the organization qualifies as a nonprofit organization as defined by Section 2001.002. If the organization is not required to obtain a federal tax exemption under 26 U.S.C. Section 501, the organization's net proceeds are dedicated to the charitable purposes of the organization only if directed to a cause, deed, or activity that is consistent with the purposes and objectives for which the organization qualifies as an authorized organization under Section 2001.002.

TEX. OCC. CODE §2001.454(b); *see also id.* § 2001.002(7).

A plain reading of the above definition, which is obviously quite broad, does not support the Commission's assertion that an organization's use of bingo proceeds for political advocacy is inconsistent with the charitable purpose requirement absent the restrictions in § 2001.456. *Cf. R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future and Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) ("We ordinarily construe a statute so as to give effect to the Legislature's intent as expressed in its plain language."). The definition shows that the requirement is satisfied so long as bingo proceeds are used for a "cause, deed, or activity *that is consistent with*" the purpose for which an organization received its federal tax exemption and qualified as a charitable organization under state law. TEX. OCC. CODE § 2001.454(b) (emphasis added). It is easy to imagine scenarios where a charity could use political advocacy to advance its charitable purpose in a way consistent with this definition.[3] As the Charities point out, the VFW lobbies in support of property tax exemptions for disabled veterans and for veteran entitlement programs offered through the Veterans Administration. We see no reason why these projects violate the above definition, and the Commission provides no basis to conclude otherwise.

---

[3] The court is aware that 26 U.S.C. § 501 restricts the amount of political advocacy certain nonprofit organizations may engage in to remain eligible for a federal tax exemption. *See, e.g.*, 26 U.S.C. §§ 501(c)(3), (h). Nevertheless, we find no support for the Commission's broad assertion that any expenditure by a charity for political advocacy is inherently inconsistent with a tax exemption granted under 26 U.S.C. § 501.

No. 11-50932

Nor is the Commission's interpretation of the charitable purpose requirement entitled to deference. The Texas Supreme Court has explained that it will "generally uphold an agency's interpretation of a statute it is charged . . . with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" *Citizens for a Safe Future and Clean Water*, 336 S.W.3d at 625 (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)). However, that deference is "tempered by several considerations." *Id.*

> It is true that courts give some deference to an agency regulation containing a reasonable interpretation of an ambiguous statute. But there are several qualifiers in that statement. First, it applies to formal opinions adopted after formal proceedings, not isolated comments during a hearing or opinions [in a court brief]. Second, the language at issue must be ambiguous; an agency's opinion cannot change plain language. Third, the agency's construction must be reasonable; alternative *unreasonable* constructions do not make a policy ambiguous.

*Id.* (alteration in original) (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747–48 (Tex. 2006)). The Commission has not pointed to any formal opinion interpreting § 2001.454 to include an independent prohibition on political advocacy. And while the Bingo Act certainly defines the term "charitable purpose" very broadly, the definition is not ambiguous.

The Charities have standing to bring their claims.

*B. Do the Challenged Provisions Penalize Speech?*

Relying heavily on the Supreme Court's opinion in *Citizens United,* 130 S. Ct. 876, the district court concluded that the restrictions on using bingo proceeds for lobbying or to support or oppose ballot measures violate the First Amendment because they burden political speech and fail to satisfy strict scrutiny. The district court also concluded that the restrictions violate the

9

unconstitutional conditions doctrine because they require, as a condition of participating in the State's charitable bingo program, that charities not exercise their right to engage in political speech.

The Commission argues that the challenged provisions do not penalize speech at all. It contends that the charitable bingo program is a state subsidy provided for the benefit of qualifying charities and that the challenged provisions simply represent a decision by the State not to subsidize political speech. The Supreme Court has made clear, the Commission argues, that a decision not to subsidize speech does not equate to a penalty on speech. The Commission maintains that the challenged provisions do not violate the unconstitutional conditions doctrine because they apply only to bingo proceeds, and therefore only restrict speech within the confines of the State's charitable bingo program. It notes that charities can participate in the bingo program and still engage in political advocacy; they must simply use funds other than those generated from bingo.

We begin by noting that the Charities have challenged the facial validity of the Bingo Act's speech restrictions. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). That the challenged provisions "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid."[4] *Id*. We briefly review the principles underlying the unconstitutional conditions doctrine as well

---

[4] Considering that the political advocacy restrictions have been present in the Bingo Act since 1983, we would have anticipated an as applied challenge.

No. 11-50932

as the related concept that government can subsidize some activities to the exclusion of others.[5]

"In the most general sense, the unconstitutional-conditions doctrine examines the extent to which government benefits may be conditioned or distributed in ways that burden constitutional rights or principles." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 286 (5th Cir. 2005). One of the most frequently cited cases discussing the doctrine is *Perry v. Sindermann*, 408 U.S. 593 (1972). That case involved a claim by a professor at a state university alleging that his right to free speech was violated because he was discharged for publicly criticizing the university's administrative policies. *Id.* at 594–96. The Court held that the denial of a government benefit (a teaching position) cannot be predicated on the exercise of a constitutional right. The Court explained:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly. Such interference with constitutional rights is impermissible.

---

[5] We acknowledge that these principles are sometimes difficult to reconcile. *See* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 1013 (4th ed. 2011) (discussing the intersection of the unconstitutional conditions doctrine and the notion that government can subsidize some activities to the exclusion of others).

No. 11-50932

*Id.* at 597 (internal citation and quotation marks omitted). While the precise boundaries of the unconstitutional conditions doctrine can be difficult to define,[6] the Supreme Court has repeatedly reaffirmed the doctrine's basic premise. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) ("[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." (internal quotation marks omitted)); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996); *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) ("Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government . . . .").

As the Charities acknowledge, however, the Supreme Court has also held that when government provides a subsidy it is entitled to define the parameters of the subsidized program, even if that means excluding certain types of speech. The Supreme Court explained this principle in *Rust v. Sullivan*, 500 U.S. 173 (1991). That case involved a federal program providing funding for family planning services. *Id.* at 178. The legislation establishing the program made clear that abortion was not an approved method of family planning. *Id.* The Department of Health and Human Services promulgated regulations that required, as a condition of participating in the program, that service providers not advocate for abortion (including lobbying) or provide abortion counseling within the scope of the program. *Id.* at 179–81. The service providers challenged those restrictions, arguing that they violated the unconstitutional conditions doctrine because they conditioned receipt of a government benefit (participation in a government program) on the relinquishment of their First Amendment right to advocate for abortion. *Id.* at 196.

---

[6] *See id.* at 1010–13.

No. 11-50932

The Court held that the unconstitutional conditions doctrine did not apply because "the Government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized. The . . . regulations do not force the . . . grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from [program] activities." *Id.* at 196. Responding to the service providers' argument that the speech restrictions constituted impermissible viewpoint discrimination, the Court expounded on the concept that government may subsidize certain activities and not others:

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of another. *A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right. A refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty on that activity.* There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.

*Id.* at 193 (emphasis added) (internal quotations and citations omitted).

The Court also applied this principle in *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), which involved restrictions similar to those at issue here. In that case, a nonprofit organization challenged a federal statute prohibiting tax exemptions for organizations whose activities include a substantial amount of lobbying. *Id.* at 542 & n.1. The organization argued that the statute violated the unconstitutional conditions doctrine because it conditioned a government benefit (a tax exemption) on the recipient giving up its right to engage in political speech. *Id.* at 545. The Supreme Court disagreed.

No. 11-50932

As in *Rust*, it noted that the plaintiff remained free to exercise its speech rights (lobby) outside the scope of the government tax exemption program. *Id.* at 544–45. The Court equated the tax exemption to a government subsidy and held that the restrictions were simply a choice by the government not to subsidize lobbying. *Id.* at 544, 545–46. The Court made clear that government's decision not to subsidize the exercise of a constitutional right does not equate to a penalty on the right. *See id.* at 546 ("Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for [plaintiff's] lobbying."); *id.* at 549 ("We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right . . . ."); *see also United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210–12 (2003) (rejecting an argument that libraries' speech rights were violated by requiring that they restrict internet access in order to receive a federal subsidy because "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity" (quoting *Rust*, 500 U.S. at 193)).

We agree that the Bingo Act's political advocacy restrictions fall within government's power to subsidize some activities to the exclusion of others and therefore do not penalize political speech. This case is distinguishable from *Citizens United* in two key respects. *Citizens United* involved a challenge to a federal statute prohibiting corporations from making expenditures for speech relating to federal elections. *Citizens United*, 130 S. Ct. at 887–88. Unlike this case, *Citizens United* did not involve speech restrictions in the context of a government subsidy. Here, the State has created a subsidy program where select charities are permitted to engage in a gambling activity in order to raise extra money for their charitable causes. As a condition of participating in the program, and receiving the extra money, the state requires that the money not be used for political advocacy. This requirement does not penalize political speech; it simply

14

represents a decision by the State not to subsidize that activity. *See Rust*, 500 U.S. at 193 ("A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." (quoting *Regan*, 461 U.S. at 549)); *see also Am. Library Ass'n*, 539 U.S. at 211–12.

The Charities argue that the State's charitable bingo program cannot be construed as a subsidy because it is implemented by means of a licensing scheme instead of cash payments or tax exemptions. They contend that the principles set forth in *Rust* and *Regan* apply only to subsidy programs where "the government is providing funds from its treasury to the beneficiary." These arguments, however, place form over substance. In creating the charitable bingo program, the State established a narrow exception to the State's ban on bingo in order to allow a limited group of charities to conduct bingo games, free of competition, to generate extra revenue. As the Texas Constitution makes clear, this extra revenue is authorized to the limited extent that it is used for the charitable purposes of the organization. *See* Tex. Const. art. III, § 47(b). That this supplemental income stream is accessible by way of a license, instead of cash payments or a tax exemption, does not change the fact that the bingo program constitutes a government subsidy for participating charities.

The Charities further argue that because the charitable bingo program utilizes a licensing scheme, any decision construing the program as a subsidy for purposes of *Rust* and *Regan* is tantamount to equating all government licenses to subsidies, which would empower government to restrict any speech funded by licensed activity.[7] There are, of course, many significant distinctions between a commercial occupational license and a state charitable gaming program, created by the state constitution, that allows select charities to raise extra money

---

[7] The Charities acknowledge that this fear is hypothetical at this point, as no other provision in the Texas Occupations Code restricts political advocacy funded by a licensed activity.

through a gambling activity on the condition the money is used for the organizations' charitable purpose. Suffice to say, however, that we reject the notion that commercial occupational licences are subsidies, and hold only that the State's charitable bingo program, established in the Texas Constitution and implemented by the Bingo Act, constitutes a subsidy for participating charities.[8]

*Citizens United* is also distinguishable in that it involved a statute that imposed an "outright ban" on specific types of political speech. *Citizens United*, 130 S. Ct. at 897–98. In other words, the restrictions at issue in *Citizens United* completely foreclosed any way for corporations to engage in the prohibited political speech. *Id.* The provisions at issue in this case, however, only prohibit the use of *bingo proceeds* for political advocacy and therefore only restrict speech within the scope of the State's charitable bingo program. As explained in *Rust*, the unconstitutional conditions doctrine is implicated when government requires, as a condition of participating in a government program, that the participant not exercise a constitutional right *outside* the scope of the program. *See Rust*, 500 U.S. at 197 ("[O]ur 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."); *see also Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, No. 12-10, 570 U.S. __, 2013 U.S. LEXIS 4699, at *16–24 (U.S. June 20, 2013) (reaffirming this principle). The challenged provisions in this case do nothing to restrict speech outside the scope of the

---

[8] We also reject the Charities' argument that the challenged provisions discriminate on the basis of the speaker's identity because they apply to nonprofit organizations participating in the charitable bingo program, but not for-profit gambling businesses licensed to hold horse and dog races under the Texas Racing Act, Tex Rev. Civ. Stat. art. 179e, § 1.02 (2012). As explained above, the political advocacy restrictions represent a decision by the State not to subsidize political advocacy, and the decision not to subsidize certain types speech does not equate to a penalty on that speech. *See Rust* 500 U.S. at 193.

No. 11-50932

State's bingo program. Charities are free to participate in the bingo program and engage in political advocacy; they simply must not use bingo proceeds to do so.

## CONCLUSION

The Bingo Act's restrictions on the use of bingo proceeds for political advocacy are permissible conditions on a government subsidy and do not operate to penalize speech. Accordingly, we REVERSE the judgment of the district court and all relief granted therein.

No. 11-50932

CARL E. STEWART, Chief Judge, dissenting:

I agree with the majority's conclusion that the Charities have standing to bring this suit. However, because I conclude that the Bingo Act's political advocacy restrictions are facially invalid, I would affirm the district court's judgment and permanently enjoin enforcement of the subject provisions. I therefore respectfully dissent from the majority's opinion upholding the restrictions as permissible conditions on a government subsidy.

The Bingo Act does not provide the Charities with a government "subsidy," as that concept is understood in the Supreme Court's jurisprudence, simply because there is no direct or indirect grant of public funds or other in-kind benefit to the Charities. Accordingly, the Act's political speech restrictions constitute unconstitutional conditions on a governmental benefit, *i.e.*, a license to conduct bingo games, because they fail to survive strict scrutiny.

## I.

The majority holds that "the Bingo Act's political advocacy restrictions fall within government's power to subsidize some activities to the exclusion of others and therefore does not penalize political speech." *Ante*, at 14. This conclusion is rooted in the Supreme Court's jurisprudence regarding the government's power to attach conditions to its allocation of public funds, which, in the case of the federal government, arises from Congress's spending power.

The Spending Clause of the United States Constitution authorizes Congress "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defen[s]e and general Welfare of the United States[.]" U.S. Const. art. I, § 8, cl. 1. "The Clause provides Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities. That power includes the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l,*

No. 11-50932

*Inc.*, 133 S. Ct. 2321, 2327-28 (2013) (citation omitted); *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to this [spending] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" (citations omitted)). State legislatures likewise have broad latitude in exercising their spending powers. *See Leathers v. Medlock*, 499 U.S. 439, 451 (1991) (citing to cases recognizing this broad authority). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Alliance for Open Soc'y*, 133 S. Ct. at 2328 (citations omitted).

## II.

The majority relies on two Supreme Court cases for its holding that the Bingo Act imposes permissible speech restrictions on a government subsidy: *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), and *Rust v. Sullivan*, 500 U.S. 173 (1991). I discuss each in turn.

In *Regan*, the Supreme Court held that the Internal Revenue Code's ("Code") grant of tax exemption for certain nonprofit organizations, and its denial of tax-deductible contributions to those that do not engage in substantial lobbying activities, do not violate the First Amendment. 461 U.S. at 542-51. At issue in *Regan* were two provisions of the Code, sections 501(c)(3) and 501(c)(4). *See Regan*, 461 U.S. at 542-44 (citing 26 U.S.C. §§ 501(c)(3), (4)).[1] Section 501(c)(3) grants tax exemption to certain nonprofit organizations "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation . . . and which does not participate in, or

---

[1] While these provisions have been amended since *Regan* was decided in 1983, the substance of the provisions remains unchanged.

19

No. 11-50932

intervene in . . ., any political campaign on behalf of (or in opposition to) any candidate for public office." In turn, 26 U.S.C. § 170(c)(2) allows taxpayers who contribute to these 501(c)(3) organizations to deduct the amount of their contributions on their federal income tax returns. On the other hand, Section 501(c)(4) grants tax-exempt status to certain nonprofit organizations, but contributions to these 501(c)(4) organizations are not tax-deductible. Unlike Section 501(c)(3) organizations, Section 501(c)(4) organizations are allowed to engage in substantial lobbying to advance their exempt purposes. *Regan*, 461 U.S. at 543. The plaintiff in *Regan*, Taxation With Representation ("TWR"), challenged the prohibition against substantial lobbying under Section 501(c)(3) "because it want[ed] to use tax-deductible contributions to support substantial lobbying activities." *Id*. at 543-44.

The Court upheld the Code's lobbying restrictions as a permissible condition on a government subsidy. *Regan*, 461 U.S. 543-46. In so holding, the Court explained the effect of the tax exemption system:

> Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income. Deductible contributions are similar to cash grants of the amount of a portion of the individual's contributions. The system Congress has enacted provides this kind of subsidy to non profit civic welfare organizations generally, and an additional subsidy to those charitable organizations that do not engage in substantial lobbying. In short, Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations undertake to promote the public welfare.

*Id*. at 544 (footnote omitted).

The Code allows a 501(c)(3) organization to create a 501(c)(4) organization to conduct its lobbying activities, a structure TWR previously had in place.

20

*Regan*, 461 U.S. at 544.  Importantly, the Court noted, however, that a Section 501(c)(3) organization could not subsidize its Section 501(c)(4) affiliate because "public funds might be spent on an activity Congress chose not to subsidize." *Regan*, 461 U.S. at 544.  Thus, the Court equated tax-deductible donations to "public funds," since the donor can then reduce his or her taxable income by this amount.  *See also id.* at 544 & n.6 (characterizing the "congressional purpose" as "ensuring that no tax-deductible contributions are used to pay for substantial lobbying").  In this way, *Regan* indicates that the government's indirect grant of public funds, vis-á-vis the tax deductions, allows the government to condition the nonprofit organizations' receipt of those tax-deductible donations on certain First Amendment restrictions.

*Rust* upheld certain conditions on federal funds for family planning services which required that service providers not advocate for abortion or provide abortion counseling with funds for the program, Title X.  *Rust*, 500 U.S. at 178-81, 196.  The Court stated: "[W]e have here not the case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded."  *Id.* at 194-95.  The Court relied on its prior precedent upholding conditions that would be violative of the Constitution if not attached to a grant of public funds: "We have recognized that Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use."  *Id.* at 195 n.4 (citations omitted).

Accordingly, the common thread in *Rust* and *Regan* is that the government may attach certain speech restrictions to funds linked to the public treasury–when either granting cash subsidies directly from the public coffers (*Rust*) or approving the withholding of funds that otherwise would go to the public treasury (*Regan*).  *See also Nat'l Endowment for the Arts v. Finley*, 524

U.S. 569, 587-88 (1998) ("[A]lthough the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake. . . . Congress has wide latitude to set spending priorities." (citing *Regan*, 461 U.S. at 549)); Jason Mazzone, *The Waiver Paradox*, 97 Nw. U. L. Rev. 801, 821-22 (2003) ("The rationale underlying these cases upholding conditions attached to government benefits [including *Rust* and *Regan*] appears to be that they all involve programs in which the government spends money to promote some social goal.").

In these ways, the bingo program in Texas is wholly distinguishable from the subsidies in *Regan*[2] and *Rust*,[3] simply because no public monies or

---

[2] *Regan* was also predicated upon the government's broad authority in establishing tax policy, another feature which sets that case apart from the instant case. *See Regan*, 461 U.S. at 547 ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."); *see also* Lloyd Hitoshi Mayer, *Charities and Lobbying: Institutional Rights in the Wake of* Citizens United, 10 Election L.J. 407, 416 (2011) ("[The Supreme Court] has consistently showed significant deference to Congress when it comes to tax law even when addressing constitutional challenges." (citations omitted)).

[3] *Rust* is further distinguishable because that case involved governmental speech, where the state has a particularly strong interest in safeguarding a governmental program's message:

> The Court in *Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting the holding in later cases, however, we have explained *Rust* on this understanding. We have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like *Rust*, in which the government "used private speakers to transmit specific information pertaining to its own program." As we said in [*Rosenberger v. Rector & Visitors of University of Virginia,* 515 U.S. 819, 833 (1995)], "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee."

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (alteration in original) (other

"spending" by the state are involved. The Black's Law Dictionary definition of "subsidy" is informative:

> A grant, [usually] made by the government, to any enterprise whose promotion is considered to be in the public interest. Although governments sometimes make direct payments (such as cash grants), subsidies are [usually] indirect. They may take the form of research-and-development support, tax breaks, provision of raw materials at below-market prices, or low-interest loans or low-interest export credits guaranteed by a government agency.

Black's Law Dictionary 1565 (9th ed. 2009). Aside from the Charities' promotion of the public interest, the licensing scheme in the Bingo Act does not fall into even a broad interpretation of these examples of "grants . . . made by the government." There is no direct or indirect receipt of funds from the public fisc. The only "grant" here is the legislative authority to conduct what would be illegal otherwise–bingo games.

Moreover, the bingo games are not state-run; they are merely licensed and regulated by the state. The Commission argues that the program constitutes a subsidy in part because there is no functional difference between the current structure of the program and an alternative structure where the state runs the bingo games and then distributes the funds to the Charities itself. I disagree. In the latter scenario, the state would expend its own resources to conduct the games and make all business decisions, and the Charities would be mere passive beneficiaries of the state's grace. *Cf. Regan*, 461 U.S. at 549 ("[A]ppropriations are comparable to tax exemptions and deductions, which are also 'a matter of grace [that] Congress can, of course, disallow . . . as it chooses.'" (citation

citations omitted).

No. 11-50932

omitted)).  Here, however, the Commission's own website describes bingo as a "business."  As the Charities argue, "[t]he revenue charities realize from bingo is what they earn from the exercise of their lawful business.  It 'does not come from the government, and it does not cost the taxpayers a dime.'"  Instead, the Charities pay the state an annual licensing fee, as well as five percent of each bingo prize awarded.[4]  Tex. Occ. Code §§ 2001.104, 2001.502.

The premise upon which *Regan* and *Rust* are based–that the state has broad authority under its spending powers to attach conditions to its grant of public funds–is thus inapposite to the facts of this case.  Rather, the Bingo Act's regulatory scheme is more akin to most other occupational licenses, where the state grants an entity that satisfies certain qualifying criteria the authority to

---

[4]  A useful distinction can be drawn between this structure and that of state-run lotteries, for which states are increasingly entering into contracts with private management companies for their long-term operation.  *See* Office of Legal Counsel, U.S. Dep't of Justice, Scope of Exemption under Federal Lottery Statutes for Lotteries Conducted By a State Acting under the Authority of State Law, 2008 WL 4671395, at *1 (Oct. 16, 2008).  Federal law generally prohibits the advertisement and promotion of lotteries in interstate commerce.  *Id.* (citing 18 U.S.C. §§ 1301-04, 1953(a)).  However, federal law exempts from these prohibitions, *inter alia*, lotteries "conducted by [a] State acting under the authority of State law."  *Id.* (citations omitted).  In providing guidance regarding whether or not a lottery is "conducted by [a] State," the Office of Legal Counsel issued an advisory opinion describing some features of a state-run lottery:

> We conclude that the statutory exemption for lotteries "conducted by a State" requires that the State exercise actual control over all significant business decisions made by the lottery enterprise and retain all but a de minimis share of the equity interest in the profits and losses of the business, as well as the rights to the trademarks and other unique intellectual property or essential assets of the State's lottery. . . .
>
> [M]erely regulating the lottery, or licensing a private lottery concession pursuant to detailed standards prescribed by the State, plainly cannot be sufficient to satisfy the requirements of the statutory exemption [for lotteries conducted by a state].

*Id.* at *1, *3.  The bingo program in Texas, by contrast, has none of the features that would indicate that it is state-run.

do what would be illegal in the absence of the license–here, conduct bingo games. *See* Black's Law Dictionary 1002 (defining "license," in relevant part, as "[a] permission, [usually] revocable, to commit some act that would otherwise be unlawful"). The Charities point to several features of the bingo program that convincingly illustrate its primary function as a regulatory scheme:

> The Commission's Charitable Bingo Division is recognized by the Texas Attorney General as a "law-enforcement agency[.]"[5] It employs licensed peace officers, auditors, etc. and enjoys broad authority over all aspects of the bingo game.[6] It licenses the charities that conduct bingo as well as other related, noncharitable, occupations (bingo equipment manufacturers, lessors of bingo premises, etc.). It regulates the types of games that may be played, their frequency and times, and the qualifications of bingo employees. It distributes no government funds or any other largesse, other than the right to engage in a highly regulated trade. This is a regulatory function, utterly undifferent [sic] from other licensing agencies such as the Texas Alcoholic Beverage Commission, Texas Department of Licensing and Regulation, and the Texas Racing Commission.

These features only underscore the incongruity of the "subsidy" paradigm to the bingo program here.

As one court aptly stated, "simply because both subsidies and licenses enure a benefit does not mean they are one and the same. . . . [The government] may not use its regulatory powers to influence or penalize speech." *Satellite*

---

[5] *See* Tex. Att'y Gen., Informal Letter Ruling No. OR2012-14155, 2012 WL 4041287, at *2 (Sept. 6, 2012) ("This office has determined the [C]ommission is a law enforcement agency." (citations omitted)).

[6] *See* Tex. Occ. Code § 2001.053 ("The [C]ommission may employ officers or investigators[.]"); *id.* § 2001.051(b) ("The [C]ommission has broad authority and shall exercise strict control and close supervision over all bingo conducted in this state[.]"); *see also* Tex. Gov't Code § 467.101(a)(1) ("The [C]ommission has broad authority and shall exercise strict control and close supervision" over several activities, including bingo.).

No. 11-50932

*Broad. & Commc'ns Ass'n of Am. v. F.C.C.*, 146 F. Supp. 2d 803, 830 (E.D. Va. 2001), *aff'd*, 275 F.3d 337 (4th Cir. 2001) (citations omitted). Accordingly, I would hold that the Bingo Act creates a regulatory regime that grants the Charities a benefit–in the form of a license–to conduct bingo games, rather than a government subsidy. The Bingo Act's political speech restrictions would thus be subject to the Supreme Court's jurisprudence relating to the "unconstitutional conditions doctrine" and political speech restrictions. Once the analysis is removed from the "subsidy" realm, then, the unconstitutionality of the Bingo Act's political advocacy restrictions becomes apparent.[7]

## III.

## A.

The "unconstitutional conditions doctrine" is long-standing:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) (citation omitted) (re-affirming the unconstitutional conditions doctrine).

---

[7] It is true that the state of Texas has made a policy decision to allow only the Charities to conduct bingo games in order to provide additional income to these organizations whose missions are in the public interest. However, I would hold that the state's grant of this benefit is insufficient to bring it within the Supreme Court's jurisprudence relating to conditions on government subsidies. Further, categorizing a benefit as a subsidy does not necessarily end the analysis, as the funding conditions may still be infirm under the unconstitutional conditions doctrine. *See, e.g.*, *Alliance for Open Soc'y*, 133 S. Ct. at 2328-30 (applying the unconstitutional conditions doctrine to a speech restriction on the receipt of government funds and concluding the restriction was unconstitutional under the First Amendment).

No. 11-50932

A state's mere licensing of an entity does not empower the state to attach constitutional restrictions to the granting of that license. For example, in *44 Liquormart, Inc. v. Rhode Island*, the Supreme Court held unconstitutional under the First Amendment a state's statutory prohibition against advertisements that provided the public with accurate information relating to liquor prices. 517 U.S. 484, 489 (1996) (plurality op.). In so ruling, the Court reasoned:

> That the State has chosen to license its liquor retailers does not change the analysis. Even though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right. In *Perry v. Sindermann*, . . . the Court explained that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially his interest in freedom of speech." That teaching clearly applies to state attempts to regulate commercial speech, as our cases striking down bans on truthful, nonmisleading speech by licensed professionals attest.

*Id.* at 513 (citing, *inter alia*, *Bates v. State Bar of Ariz.*, 433 U.S. 350, 355 (1977) (licensed attorneys); *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (licensed pharmacists)) (other citations omitted); *see also R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) ("Under the unconstitutional conditions doctrine, 'a state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an entertainment permit, on an agreement to refrain from exercising one's constitutional rights[.]'" (citation omitted)).[8]

---

[8] Notably, the foregoing cases striking down First Amendment restrictions on a state's grant of a license took place in the commercial speech context. "The Constitution . . . affords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993) (citations omitted). The argument is therefore even more compelling that the restrictions on political speech here are suspect

No. 11-50932

In accordance with the Supreme Court's unconstitutional conditions jurisprudence, I conclude that the Bingo Act's political advocacy restrictions are facially invalid because they fail to survive strict scrutiny. *See, e.g.*, *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 234-39 (2d Cir. 2011), *aff'd*, 133 S. Ct. 2321 (concluding that certain restrictions on funding recipients' speech were unconstitutional conditions by analyzing the restrictions under heightened scrutiny).

**B.**

"The freedom of speech . . . which [is] secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State." *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (alterations in original) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 95 (1940)). "Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (citation omitted).

The Bingo Act prohibits the Charities from using their bingo proceeds, *inter alia*, to "support or oppose a measure submitted to a vote of the people" or "influence or attempt to influence legislation."[9]   *See* Tex. Occ. Code §§ 2001.456(2), (3). Accordingly, these prohibitions constitute facial restrictions on

---

under the unconstitutional conditions doctrine. *See R.A.V. v. St. Paul, Minn.*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring in judgment) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position; commercial speech . . . [is] regarded as a sort of second-class expression.").

[9] The Charities do not challenge the Bingo Act's prohibition on the use of bingo proceeds "to support or oppose a candidate or slate of candidates for public office." *See* Tex. Occ. Code § 2001.456(1).

28

the Charities' political advocacy, albeit within the confines of the bingo program, and are therefore subject to strict scrutiny.

## C.

The Commission asserts three rationales for the Bingo Act's political advocacy restrictions: 1) regulating gambling, including "limiting the size of the state's gambling industry"; 2) combating fraud on Texas's citizens, meaning "ensuring that [citizens'] money goes only toward the charity advertised by the bingo hall" and "not lobbyists"; and 3) protecting charities from squandering bingo revenue on  political advocacy, as opposed to their "charitable purpose." The Commission characterizes these interests as "substantial," rather than "compelling," since, as the Charities and the district court point out, the Commission never even attempts to justify the political advocacy restrictions under strict scrutiny.  Rather, the Commission feebly contends that the Bingo Act does not target political speech, even though the Act facially does just that.

As to the first asserted interest, the Commission is correct that the state has a "substantial interest" in regulating gambling, including limiting the size of the industry. *See Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 185-86 (1999) (recognizing that the government may have a "substantial interest" in restricting gambling to combat its related social ills, including corruption, organized crime, bribery, drug trafficking, and gambling addiction). Aside from the fact that the Commission cites to no case identifying this interest as "compelling," as opposed to "substantial,"[10] however, the Commission fails to explain how its interest in regulating *gambling* translates into a compelling

---

[10] Under the less rigorous, intermediate scrutiny, a regulation will be upheld under the First Amendment if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997) (internal quotation marks and citation omitted).

interest in regulating *political speech* that may or may not relate to gambling. As the Supreme Court stated in *44 Liquormart*:

> The text of the First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more dangerous than attempts to regulate conduct. . . . [T]he First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends.

517 U.S. at 512; *see also Greater New Orleans Broad.,* 527 U.S. at 193. The Commission fails to connect the conduct it has broad power to regulate with the political advocacy restrictions in the Bingo Act. This same logic applies to the Commission's asserted interests in combating fraud and ensuring that bingo proceeds go towards the Charities' charitable purposes.

The Commission also fails to explain why the Charities' political speech should be curtailed in order to limit the size of the gambling industry, while other gambling operators, *i.e.*, dog and horse racetrack operators, may engage in unfettered political advocacy. The Texas Racing Act ("Racing Act") authorizes racetrack operators to conduct gambling within the state. Tex. Rev. Civ. Stat. art. 179e, § 1.02 (2012). However, these operators are not subject to any political speech restrictions. *See id.* This differential treatment among speakers that engage in substantially similar conduct–facilitating gambling in the state–undermines the legitimacy of the state's asserted interest in limiting the gambling industry's size. *See Citizens United*, 558 U.S. at 341 ("We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers.").

In *Citizens United*, the Supreme Court held that the government may not, under the First Amendment, suppress political speech on the basis of the speaker's corporate identity. *Citizens United*, 558 U.S. at 365. *Citizens United*

involved a facial First Amendment challenge to 2 U.S.C. § 441b, which, *inter alia*, made it unlawful for "any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with" certain elections. *See* 2 U.S.C. § 441b(a). The Supreme Court struck down the relevant provisions because they constituted a ban on corporate speech, notwithstanding the fact that corporations could form political action committees that would be able to engage in advocacy: "[T]he Government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." *See Citizens United*, 558 U.S. at 365. The relevant restrictions in *Citizens United* also exempted media corporations; those companies were not subject to § 441b's ban on corporate expenditures. *Id.* at 351. The Court found no compelling reason for differentiating between media corporations and other corporations, in light of the admittedly dubious governmental interest in preventing "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas," *i.e.*, the "antidistortion rationale." *See id.* at 348 (citation omitted). The Court reasoned:

> There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. . . .
>
> [B]y its own terms, the law exempts some corporations but covers others, even though both have the need or the motive to communicate their views. . . . This differential treatment cannot be squared with the First Amendment.

*Id.* at 352 (citations omitted). Accordingly, the Court concluded: "The law's exception for media corporations is, on its own terms, all but an admission of the invalidity of the antidistortion rationale." *Id.*

No. 11-50932

Similarly here, Texas law's exemption of dog and horse racetrack operators from any political speech restrictions undermines the Commission's asserted interest in curtailing the size of the gambling industry.[11] *See also The Fla. Star*, 491 U.S. 524, 540 (1989) (holding that a statute's underinclusiveness "raises serious doubts" about whether the law in fact serves the government's asserted interest).[12]

More importantly, even if the Commission's interests are compelling, the political advocacy restrictions are not narrowly tailored to achieve those ends. A law is narrowly tailored if it "advances the state's interest . . ., does not sweep

[11] The Commission contends that, while "horse-track racing is gambling," "it has not been the subject of a longstanding constitutional ban, like games of pure chance." Rather, the Commission contends, "[s]ince early statehood, the Texas Constitution has banned lotteries, bingo, gift enterprises, and other 'schemes for the distribution of prize by chance.'" (citing *State v. Randle*, 41 Tex. 292 (1874)). As a result, the Commission observes that no constitutional amendment was necessary before passage of the Racing Act, unlike the Bingo Act. Further, the Commission points out that "horse-track races may be conducted by any entity or individual, whether non-profit or for-profit, who applies for a license . . . including the [C]harities in this case."

Nevertheless, the Commission has provided no compelling reason for this court to differentiate between operators of bingo games and operators of dog and horse racetracks, especially in light of *Citizens United*. The Commission's historic account of the development of gambling fails to explain how this history translates into a compelling reason for the disproportionate burden on the Charities' First Amendment *rights* specifically. Again, the Commission's argument perhaps explains why there would be differences in the regulatory schemes of the two forms of gambling, but this distinction does not explain why the Charities' political speech rights should be disproportionately burdened as a result. Moreover, the Texas legislature authorized the two forms of gambling in the state within five years of one another: It passed the Bingo Act first, in 1981, following the voters' approval of a constitutional amendment, and it passed the Racing Act in 1986. *See* Bingo Act, 67th Leg., 1st C.S., ch. 11, 1981 Tex. Gen. Laws 85 (current version at Tex. Occ. Code § 2001.001 *et seq.*); Racing Act, 69th Leg., 2d C.S., ch. 19, § 1, 1986 Tex. Gen. Laws 48, 53 (current version at Tex. Rev. Civ. Stat. art. 179e). The fact that the there was no formal, historic ban on racetrack betting thus seems of limited relevance for our purposes.

[12] Texas's differential treatment of the speech rights of gambling operators is likewise suspect, in and of itself, under *Citizens United*. However, I would not necessarily conclude that this difference alone is sufficient to rule the political advocacy restrictions facially invalid; rather, it informs the analysis of whether the state has proffered a compelling justification for the speech restrictions.

too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 752 (8th Cir. 2005) (en banc) (citations omitted).

The availability of nonspeech alternatives for regulating the gambling industry, combating fraud, and ensuring that the Charities use their bingo proceeds for charitable purposes render the Bingo Act's political advocacy restrictions facially invalid because the speech restrictions are not the least restrictive means to achieve these ends. *See, e.g.*, *Greater New Orleans Broad.*, 527 U.S. at 192 (suggesting nonspeech alternatives for curtailing gambling, including "a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637-38 (1980) (discussing how an unconstitutional statute prohibiting charitable fundraising could have been more narrowly tailored by reasoning that "[e]fforts to promote disclosure of the finances of charitable organizations also may assist in preventing fraud by informing the public of the ways in which their contributions will be employed"); *see also Riley v. Nat'l Federation of the Blind of N.C., Inc,* 487 U.S. 781, 790-92 (1988) (citations omitted) (holding that a statute regulating charities' solicitation by professional fund raisers was not narrowly tailored to promoting the state's interest in protecting the public and charities from fraud, and to ensuring maximum financial support for the charities for their own benefit). Regarding the Commission's third asserted interest, the Bingo Act already requires that the Charities use the bingo proceeds for their charitable purposes, and, as the majority concludes, "an organization's use of bingo proceeds for political advocacy is [not] inconsistent with the charitable purpose requirement absent

No. 11-50932

the restrictions in [Tex. Occ. Code] § 2001.456," *see ante*, at 9, restrictions which I conclude are unconstitutional and severable.

Moreover, even though the Bingo Act does not constitute a complete ban on the Charities' political advocacy, the Commission has not identified a compelling enough interest in burdening the Charities' First Amendment rights in the first instance. While restricting the Charities' political advocacy using the bingo proceeds may be more narrowly tailored than an outright ban on all political speech, there are less restrictive (*i.e.*, nonspeech) means of achieving the state's asserted interests here. Accordingly, because the Bingo Act's political advocacy restrictions fail to satisfy strict scrutiny, I conclude that they are facially invalid under the First Amendment.

## IV.

I therefore would affirm the district court's judgment concluding that the political advocacy restrictions are unconstitutional and permanently enjoining their enforcement.