# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 11-50932

————

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2014

Lyle W. Cayce
Clerk

DEPARTMENT OF TEXAS, Veterans of Foreign Wars of the United States; AMVETS DEPARTMENT OF TEXAS, INCORPORATED;  AMVETS POST 52, INCORPORATED; AMVETS POST 52, AUXILIARY, INCORPORATED; THE GREAT COUNCIL OF TEXAS, Improved Order of Redmen;  REDMEN WAR EAGLE TRIBE NO. 17; REDMEN TRIBE NO. 21 GERONIMO; REDMEN RAMONA COUNCIL NO. 5; THE INSTITUTE FOR DISABILITY ACCESS, INCORPORATED, doing business as Adapt of Texas; TEMPLE ELKS LODGE NO. 138, Benevolent and Protective Order of Elks of The United States of America, Incorporated; BRYAN LODGE NO. 859, Benevolent and Protective Order of Elks of The United States of America, Incorporated; AUSTIN LODGE NO. 201, Benevolent and Protective Order of Elks of The United States of America, Incorporated; ANNA FIRE AND RESCUE, INCORPORATED,

Plaintiffs-Appellees,

v.

TEXAS LOTTERY COMMISSION; GARY GRIEF, Executive Director in His Official Capacity; SANDRA K. JOSEPH, Director of Charitable Bingo in Her Official Capacity; MARY ANN WILLIAMSON, Commissioner in Her Official Capacity; UNKNOWN COMMISSIONER IN OFFICIAL CAPACITY; J. WINSTON KRAUSE, Commissioner in His Official Capacity,

Defendants-Appellants.

————

Appeal from the United States District Court
for the Western District of Texas

————

No. 11-50932

Before STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH, DeMOSS, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, and HIGGINSON, Circuit Judges. *

STEWART, Chief Judge, joined by JOLLY, DAVIS, JONES, SMITH, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, and HIGGINSON:

The issue presented in this appeal is the constitutionality of political advocacy restrictions contained in the Texas Bingo Enabling Act ("the Bingo Act"). The Bingo Act allows charitable organizations to raise money by holding bingo games on the condition that the money is used only for the organizations' charitable purpose. Plaintiffs-Appellees filed suit challenging these restrictions, arguing they violate their speech rights under the First Amendment. The district court granted summary judgment in favor of Appellees and issued a permanent injunction preventing enforcement of the challenged provisions. The panel majority opinion, which reversed the district court, was vacated by our decision to rehear this case en banc. *Dep't of Tex., Veterans of Foreign Wars of the U.S. v. Tex. Lottery Comm'n*, 734 F.3d 1223 (5th Cir. 2013). For the reasons stated below, we now affirm the district court's permanent injunction and summary judgment.

## I. BACKGROUND

In Texas, gambling is generally prohibited. Tex. Const. art. III, § 47. However, in 1980, the Texas Constitution was amended to establish an exception to this prohibition for charitable bingo. *Id.* § 47(b). The Texas legislature implemented this exception through the Bingo Act, which authorizes qualified nonprofit organizations to host bingo games. Tex. Occ.

---

* Judge King, having taking senior status before the rehearing en banc, did not participate in this decision. Judge Costa did not participate in the en banc rehearing or in this decision.

No. 11-50932

Code Ann. § 2001.001 *et seq.* The Bingo Act contains the following political advocacy restrictions:

> A licensed authorized organization may not use the net proceeds from bingo directly or indirectly to: (1) support or oppose a candidate or slate of candidates for public office; (2) support or oppose a measure submitted to a vote of the people; or (3) influence or attempt to influence legislation.

*Id.* § 2001.456.

Plaintiffs-Appellees are a host of nonprofit organizations (and/or their parent organizations) licensed to conduct bingo in Texas ("the Charities"). The lead Plaintiffs are the Department of Texas, Veterans of Foreign Wars ("VFW") and the Institute for Disability Access, d/b/a ADAPT of Texas. On June 25, 2010, they brought suit under 42 U.SC. § 1983 against the commissioners and two executive officers of the Texas Lottery Commission, the state agency responsible for bingo licensing and regulation (collectively, "the Commission").[1]  Specifically, they alleged that the latter two of these restrictions, Sections 2001.456(2)–(3), violate their right to freedom of speech.

The First Amendment challenge was twofold: First, the Charities claimed that subsections two and three of Section 2001.456 are facially unconstitutional because they are a direct abridgement of speech with no compelling or substantial justifying interest. Second, they claimed the law unconstitutionally discriminates between the Charities and similarly situated businesses, such as racetracks, which are not prohibited from using their revenue for political purposes.

In light of the then-upcoming legislative session, the Charities moved for entry of a preliminary injunction barring enforcement of the political speech

---

[1] The Texas Lottery Commission was originally a defendant, but it was dismissed based on sovereign immunity.

restrictions in Section 2001.456(2)–(3).   The district court granted the Charities' request on October 29, 2010 and explained its reasoning in an extensive opinion.  Relying heavily on the Supreme Court's opinion in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), the district court concluded that the restrictions in Section 2001.456 violate the First Amendment because they burden political speech and fail to satisfy strict scrutiny.   The district court also concluded that the restrictions are unconstitutional conditions because they require that, as a condition of participating in the state's charitable bingo program, the Charities not exercise their right to engage in political speech.

The Charities moved for summary judgment, which the district court granted, permanently enjoining the Commission from enforcing the invalid provisions.  The Commission appealed.  A unanimous panel of this court originally reversed the district court's summary judgment in favor of the Charities and its permanent injunction preventing enforcement of the challenged statutory provisions.  *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 698 F.3d 239 (5th Cir. 2012), *withdrawn*, 727 F.3d 415 (5th Cir. 2013), *vacated*, 734 F.3d 1223 (5th Cir. 2013).  After panel rehearing, a panel majority issued a revised opinion that again reversed the district court's judgment.  *Texas Lottery Comm'n*, 727 F.3d 415, *vacated*, 734 F.3d 1223.  Thereafter, this court granted en banc rehearing.  734 F.3d 1223.

## II. STANDARD OF REVIEW

We review a district court's summary judgment de novo, applying the same standards as the district court.  *Ballard v. Devon Energy Prod. Co.*, 678 F.3d 360, 365 (5th Cir. 2012).  Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

4

## III. DISCUSSION

The Commission first attacks the Charities' standing to bring the underlying suit.  The Commission next argues that because the Bingo Act creates a subsidy the state may constitutionally attach restrictions to funds earned by a charity through participation in the program.  Additionally, the Commission argues that even if the Bingo Act does not create a subsidy, the restrictions are permissible under the First Amendment.  We address each argument in turn.

### A. Standing[2]

Constitutional standing is a jurisdictional question that we review de novo.  *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).  To establish Article III standing, a plaintiff must show "an injury-in-fact caused by a defendant's challenged conduct that is redressable by a court." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010).  For a plaintiff's claim to be redressable, it must be "likely, as opposed to merely speculative, that a favorable decision will redress the plaintiff's injury."  *S. Christian Leadership Conference v. Supreme Court of State of La.*, 252 F.3d 781, 788 (5th Cir. 2001).  "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his *every* injury."  *LeBlanc*, 627 F.3d at 123 (alteration in original) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

The Commission argues that the Charities' claims are not redressable because the relief they seek—the ability to use bingo proceeds for political advocacy—is independently foreclosed by the requirement in the Texas

---

[2] We agree with the panel majority's conclusion that the Charities have standing to sue.  *See Texas Lottery Comm'n*, 727 F.3d at 419–21.  Accordingly, we generally adopt the panel majority's standing analysis herein.  *See id.*

No. 11-50932

Constitution and the Bingo Act that bingo proceeds be used only for an organization's charitable purpose. *See* Tex. Const. art. III, § 47(b)(1); Tex. Occ. Code Ann. § 2001.454(a). According to the Commission, even if we enjoin enforcement of the political advocacy restrictions, the charitable purpose requirement, which the Charities have not challenged, would still prohibit the Charities from using bingo proceeds for lobbying or to support or oppose ballot measures. As support, the Commission argues: (1) that by enacting the challenged political advocacy restrictions, the legislature made clear that an organization's charitable purpose cannot include political activity, and (2) the Commission's interpretation of the charitable purpose requirement is reasonable and entitled to deference.

The Commission's standing argument requires that we interpret the charitable purpose requirement as containing an independent prohibition on the use of bingo proceeds for political advocacy in addition to the prohibition in Section 2001.456 challenged by the Charities. While the term "charitable purpose" is not defined in the Texas Constitution, it is defined in the Bingo Act. *See Owens v. State*, 19 S.W.3d 480, 484 (Tex. App.—Amarillo 2000, no pet.) ("The [Texas] Legislature may define terms which are not defined in the Constitution itself . . . ."). We interpret Texas statutes the way we believe the Texas Supreme Court would do so. *See United States v. Escalante*, 239 F.3d 678, 681 n.12 (5th Cir. 2001); *see also Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 508 n.72 (5th Cir. 2001). The Bingo Act defines "charitable purpose[]" as follows:

> Except as otherwise provided by law, the net proceeds derived from bingo and any rental of premises are dedicated to the charitable purposes of the organization only if directed to a cause, deed, or activity that is consistent with the federal tax exemption the organization obtained under 26 U.S.C. Section 501 and under which the organization qualifies as a nonprofit organization as defined by Section 2001.002. If the organization is not required to

6

> obtain a federal tax exemption under 26 U.S.C. Section 501, the organization's net proceeds are dedicated to the charitable purposes of the organization only if directed to a cause, deed, or activity that is consistent with the purposes and objectives for which the organization qualifies as an authorized organization under Section 2001.002.

Tex. Occ. Code Ann. § 2001.454(b); *see also id.* § 2001.002(7).

A plain reading of the above definition, which is quite broad, does not support the Commission's assertion that an organization's use of bingo proceeds for political advocacy is inherently inconsistent with the charitable purpose requirement. *Cf. R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) ("We ordinarily construe a statute so as to give effect to the Legislature's intent as expressed in its plain language."). The definition shows that the requirement is satisfied so long as bingo proceeds are used for a "cause, deed, or activity *that is consistent with*" the purpose for which an organization received its federal tax exemption and qualified as a charitable organization under state law. Tex. Occ. Code Ann. § 2001.454(b) (emphasis added). It is easy to imagine scenarios where a charity could use political advocacy to advance its charitable purpose in a way that satisfies this definition. As the Charities point out, the VFW lobbies in support of property tax exemptions for disabled veterans and for veteran entitlement programs offered through the Veterans Administration. We see no reason why these projects violate the charitable purpose requirement as defined above, and the Commission provides no basis to conclude otherwise.

Nor is the Commission's interpretation of the charitable purpose requirement entitled to deference. The Texas Supreme Court has explained that it will "generally uphold an agency's interpretation of a statute it is charged . . . with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" *Citizens for a Safe Future &*

*Clean Water*, 336 S.W.3d at 625 (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)).  However, that deference is "tempered by several considerations."  *Id.*

> It is true that courts give some deference to an agency regulation containing a reasonable interpretation of an ambiguous statute. But there are several qualifiers in that statement.  First, it applies to formal opinions adopted after formal proceedings, not isolated comments during a hearing or opinions [in a court brief].  Second, the language at issue must be ambiguous; an agency's opinion cannot change plain language.  Third, the agency's construction must be reasonable; alternative *unreasonable* constructions do not make a policy ambiguous.

*Id.* (alteration in original) (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747–48 (Tex. 2006)).  The Commission has not pointed to any formal opinion in which it has interpreted the charitable purpose requirement as establishing a wholesale prohibition on political advocacy. And while the Bingo Act certainly defines the term "charitable purpose" very broadly, the definition is not ambiguous.  Accordingly, the Charities have standing to bring their claims.

### B. The Challenged Provisions

The Commission argues that the Bingo Act's political advocacy restrictions do not unconstitutionally burden political speech because they fall within the government's power to subsidize some activities to the exclusion of others.  This conclusion is rooted in the Supreme Court's jurisprudence regarding the government's attachment of conditions to its allocation of public funds, which, in the case of the federal government, arises from Congress's spending power.

#### 1. The Bingo Act does not create a subsidy.

The Spending Clause of the U.S. Constitution authorizes Congress "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defen[s]e and general Welfare of the United States."

No. 11-50932

U.S. Const. art. I, § 8, cl. 1. "The Clause provides Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities. That power includes the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327–28 (2013) (citation omitted); *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to this [spending] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" (citations omitted)). State legislatures likewise have broad latitude in exercising their spending powers. *See Leathers v. Medlock*, 499 U.S. 439, 451 (1991) (citing to cases recognizing this broad authority). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Alliance for Open Soc'y*, 133 S. Ct. at 2328.

The Commission principally relies on two Supreme Court cases to justify the provisions as subsidies. *See Rust v. Sullivan*, 500 U.S. 173 (1991); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983). These cases hold that the government may attach certain restrictions to direct or indirect receipt of funds from the public fisc.

In *Taxation with Representation*, the Supreme Court held that the Internal Revenue Code's ("Code") grant of tax exemption for certain nonprofit organizations that do not engage in substantial lobbying activities—and its denial of tax-deductible contributions to those that do—does not violate the First Amendment. 461 U.S. at 545–51. Specifically, § 501(c)(3) of the Code allows taxpayers who contribute to tax-exempt, non-lobbying organizations to

deduct the amount of their contributions on their federal income tax returns. *Id.* at 543. Section 501(c)(4) grants tax-exempt status to certain nonprofit organizations, but contributions to these 501(c)(4) organizations are not tax-deductible. *Id.* In upholding these provisions, the Court explained:

> Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income. Deductible contributions are similar to cash grants of the amount of a portion of the individual's contributions. The system Congress has enacted provides this kind of subsidy to non profit civic welfare organizations generally, and an additional subsidy to those charitable organizations that do not engage in substantial lobbying. In short, Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations undertake to promote the public welfare.

*Id.* at 544 (footnote omitted).

The Court noted that the Code allows a 501(c)(3) organization to create a 501(c)(4) organization to conduct its lobbying activities. *Id.* Importantly, however, a § 501(c)(3) organization could not subsidize its § 501(c)(4) affiliate because "public funds might be spent on an activity Congress chose not to subsidize." *Id.* Thus, the Court equated tax-deductible donations to "public funds," since the donor can then reduce his or her taxable income by this amount. In this way, *Taxation with Representation* indicates that the government's indirect grant of public funds, vis-á-vis the tax deductions, allows the government to condition the nonprofit organizations' receipt of those tax-deductible donations on certain First Amendment restrictions.

*Rust* upheld certain conditions on federal funds for family planning services that required that service providers not advocate for abortion or provide abortion counseling with funds for the program, Title X. 500 U.S. at 178–81, 203. The Court stated: "[W]e have here not the case of a general law

singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded." *Id.* at 194–95. The Court relied on its precedent upholding conditions that would violate the Constitution if not attached to a grant of public funds. *Id.* at 195 n.4 ("We have recognized that Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use.").

The common thread in *Rust* and *Taxation with Representation* is that the government may attach certain speech restrictions to funds linked to the public treasury—when either granting cash subsidies directly from the public coffers (*Rust*) or approving the withholding of funds that otherwise would go to the public treasury (*Taxation with Representation*). *See also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998) ("[A]lthough the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake."). The bingo program in Texas is wholly distinguishable from the subsidies in *Taxation with Representation* and *Rust* simply because no public monies or "spending" by the state are involved.[3]

---

[3] Two later Supreme Court cases, *Davenport v. Washington Education Association*, 551 U.S. 177 (2007) and *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009), are also inapposite because the Bingo Act creates a licensing program and not a subsidy. In *Davenport*, the Court upheld a law requiring that labor unions receive affirmative authorization from a nonmember before spending that nonmember's fees for election-related purposes when the fees were collected by a government employer. 551 U.S. at 191. The Court relied on the principles underlying its treatment of situations where the "government is acting in a capacity other than as regulator" and where the government subsidizes speech in reaching this holding. *Id.* at 188–89. However, in the instant case, the government is acting as a regulator and is not subsidizing speech; therefore, these underlying principles are inapplicable. In *Ysursa*, the Court held that Idaho was not required to allow a public-sector employee to deduct from his wages directly to the union's political action committee when

No. 11-50932

The Commission's interpretation contorts the definition of "subsidy." The Black's Law Dictionary defines "subsidy" as follows:

> A grant, made by the government, to any enterprise whose promotion is considered to be in the public interest. Although governments sometimes make direct payments (such as cash grants), subsidies are [usually] indirect. They may take the form of research-and-development support, tax breaks, provision of raw materials at below-market prices, or low-interest loans or low-interest export credits guaranteed by a government agency.

Black's Law Dictionary 1565 (9th ed. 2009). The licensing scheme in the Bingo Act does not fall into even a broad interpretation of these examples of "grants . . . made by the government." *See id.* There is no direct or indirect receipt of funds from the public fisc. The only "grant" here is the legislative authority to conduct what would be illegal otherwise—bingo games.

Moreover, the bingo games are not state-run; they are merely licensed and regulated by the state. The Commission argues that the program constitutes a subsidy in part because there is no functional difference between the current structure of the program and an alternative structure where the state runs the bingo games and then distributes the funds to the Charities itself. This argument is unavailing. In the latter scenario, the state would expend its own resources to conduct the games and make all business decisions, and the Charities would be mere passive beneficiaries of the state's grace. *Cf. Taxation with Representation*, 461 U.S. at 549 ("[A]ppropriations are comparable to tax exemptions and deductions, which are also 'a matter of grace [that] Congress can, of course, disallow . . . as it chooses.'" (citation

---

Idaho did allow the employee to deduct from his wages union dues. 555 U.S. at 355. In so holding, the Court relied on *Taxation with Representation* and noted that by allowing this deduction, the government was not required to aid the unions in their political speech. *Id.* at 359. Here, however, the Charities, not the government, administer the bingo games themselves in a manner similar to any other occupational license granted by the state.

12

omitted)).  Here, however, the Commission's own website describes bingo as a "business."  The bingo programs are run completely by the Charities and any funds raised are the result of the Charities' own efforts.  The Charities pay the state an annual licensing fee as well as five percent of each bingo prize awarded.  Tex. Occ. Code Ann. §§ 2001.104, 2001.502.

The premise upon which *Taxation with Representation* and *Rust* are based—that the state has broad authority under its spending powers to attach conditions to its grant of public funds—is thus inapposite to the facts of this case.    Rather, the Bingo Act's regulatory scheme is more akin to an occupational license, where the state grants an entity that satisfies certain qualifying criteria the authority to do what would be illegal in the absence of the license—here, conduct bingo games.  *See* Black's Law Dictionary 1002 (defining "license," in relevant part, as "[a] permission, [usually] revocable, to commit some act that would otherwise be unlawful").  The Charities point to several features of the bingo program that convincingly illustrate its primary function as a regulatory scheme.  For example, the Commission's Charitable Bingo Division is characterized as a "law enforcement agency."  *See* Tex. Att'y Gen., Informal Letter Ruling No. OR2012–14155, 2012 WL 4041287, at *2 (Sept. 6, 2012).  It regulates all bingo-related activities, including the types of games played, game frequency and times, and bingo-employee qualifications. Tex. Occ. Code Ann. §§ 2001.055, 2001.419, 2001.313.    The provision's placement in Texas's Occupations Code further supports its characterization as an occupational license.  All these features underscore the incongruity of the "subsidy" paradigm to the bingo program here.

As one court aptly stated, "simply because both subsidies and licenses enure a benefit does not mean they are one and the same. . . . [The government] may not use its regulatory powers to influence or penalize speech." *Satellite Broad. & Commc'ns Ass'n of Am. v. FCC,* 146 F. Supp. 2d 803, 830 (E.D. Va.

No. 11-50932

2001), *aff'd*, 275 F.3d 337 (4th Cir. 2001) (citations omitted). Accordingly, we hold that the Bingo Act creates a regulatory regime that grants the Charities a benefit—in the form of a license—to conduct bingo games, rather than a government subsidy. The Bingo Act's restrictions are thus subject to the Supreme Court's jurisprudence relating to the "unconstitutional conditions doctrine" and laws burdening political speech.

### *2. The Bingo Act includes unconstitutional conditions.*

The "unconstitutional conditions doctrine" is well-established:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) (citation omitted) (re-affirming the unconstitutional conditions doctrine).[4]

A state's mere licensing of an entity does not empower the state to attach unconstitutional restrictions to the granting of that license. For example, in

---

[4] The Supreme Court has not treated the unconstitutional conditions doctrine as an absolute prohibition. In other contexts, it has suggested that certain conditions that abridge constitutional rights can sometimes be constitutional conditions. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 836 (1987) ("[T]he Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end."). If the greater power to prohibit gambling for a good reason includes the lesser power to condition for the same reason, Texas has not exercised its lesser power to condition for such a reason. The doctrine is perhaps best summed up by *Dolan v. City of Tigard*: "Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to [the right]." 512 U.S. 374, 385 (1994) (emphasis added) (citations omitted).

No. 11-50932

*44 Liquormart, Inc. v. Rhode Island*, the Supreme Court held unconstitutional under the First Amendment a state's statutory prohibition against advertisements that provided the public with accurate information relating to liquor prices. 517 U.S. 484, 489 (1996) (plurality op.).  In so ruling, the Court reasoned:

> That the State has chosen to license its liquor retailers does not change the analysis.  Even though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right.

*Id.* at 513 (citing, *inter alia*, *Bates v. State Bar of Ariz.*, 433 U.S. 350, 355 (1977) (licensed attorneys); *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976) (licensed pharmacists)); *see also R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) ("Under the unconstitutional conditions doctrine, 'a state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an entertainment permit, on an agreement to refrain from exercising one's constitutional rights . . . .'" (citation omitted)).[5]

We conclude that because the subsidy rationale is inapplicable, the unconstitutional conditions doctrine controls.  Congress and, by extension, state legislatures may not condition the conferral of a government benefit on

---

[5] Notably, the foregoing cases striking down First Amendment restrictions on a state's grant of a license took place in the commercial speech context. "The Constitution . . . affords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993) (citations omitted).  The argument is therefore even more compelling that the restrictions on political speech here are suspect under the unconstitutional conditions doctrine. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring in judgment) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech.  Core political speech occupies the highest, most protected position; commercial speech . . . [is] regarded as a sort of second-class expression . . . .").

the forfeiture of a constitutional right. *44 Liquormart, Inc.*, 517 U.S. at 515. Accordingly, we address whether the conditions are unconstitutional burdens on political speech.

### 3. The provisions burden political speech.

As the Supreme Court instructed in *Citizens United*, "[l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." 558 U.S. at 340 (internal quotation marks and citation omitted). The Commission argues that the challenged provisions do not burden political speech; however, the express language of the Bingo Act belies that proposition. The provisions at issue prohibit the Charities from using their bingo proceeds to "support or oppose a measure submitted to a vote of the people; or [] influence or attempt to influence legislation." Tex. Occ. Code Ann. § 2001.456(2)–(3). While the provisions limit the Charities' use of bingo funds, they are nevertheless targeted at political speech. Any argument to the contrary is dubious at best. In this respect, the Bingo Act's restrictions are distinguishable from the provisions at issue in *Southern Christian Leadership Conference*.

In *Southern Christian Leadership Conference*, the Louisiana Supreme Court promulgated a rule prohibiting non-attorney student members of clinics from representing as attorneys any client that the clinic had solicited. 252 F.3d at 785. This court determined that such a rule neither prohibited nor prevented speech of any kind. *Id.* at 789. Importantly, the provision had no bearing on the speech component of the rule—the actual solicitation of clients. *Id.* It merely prohibited any non-lawyer students of the clinic from directly representing such clients. *Id.* The clinics' supervising attorneys could represent the solicited clients and the students could work on the cases in other capacities. *Id.* at 792. The restriction was on representation—it limited the

circumstances under which non-attorneys could act as attorneys. *See id.* By contrast, the restrictions at issue in this case explicitly and directly limit the Charities' ability to engage in political speech.

Because the challenged provisions constitute facial restrictions on the Charities' political speech, strict scrutiny applies. Therefore, the Commission must demonstrate that the provisions serve a compelling interest and are narrowly tailored to satisfy that interest. *See Citizens United*, 558 U.S. at 340.

*4. The provisions cannot withstand strict scrutiny.*

The Commission fails to identify a compelling state interest. It raises three rationales in support of the challenged provisions: 1) regulating gambling, including reducing the size of the gambling industry in Texas; 2) combating fraud by ensuring that bingo proceeds are only used in support of charities, not lobbyists; and 3) promoting charities—that is, ensuring charities do not forgo spending their bingo revenue on their charitable purpose by squandering those funds on political advocacy. Notably, as the Charities and the district court stated, the Commission never attempts to characterize these interests as compelling. Indeed, the Commission never purports to justify the challenged provisions under strict scrutiny review. Rather, the Commission merely contends that the rationales are substantial state interests.

The Commission's first interest—regulating gambling—fails to properly support the challenged provisions under strict scrutiny. While the Supreme Court has recognized regulating gambling as a substantial state interest, *see Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 185–86 (1999), there is no authority suggesting that it is a compelling interest. Moreover, we fail to see how Texas's interest in regulating gambling is furthered by restricting the Charities' political speech, which may or may not relate to gambling, and the Commission has failed to present any convincing argument to that effect. *See 44 Liquormart, Inc.,* 517 U.S. at 512 ("[T]he First

17

No. 11-50932

Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends.").

Equally troubling is the underinclusiveness of the challenged provisions. Whereas the Bingo Act constrains the Charities' political speech, *see* Tex. Occ. Code Ann. § 2001.456(2)–(3), other gambling operators, such as horse and dog racetrack operators, remain free to engage in unfettered political advocacy, *see* Tex. Rev. Civ. Stat. art. 179e § 1.02 (2012). Such obvious underinclusiveness undermines any argument that Texas is truly interested in regulating gambling. *See The Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989) ("[T]he facial underinclusiveness of § 794.03 raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance."); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984) ("The patent . . . underinclusiveness of § 399's ban undermines the likelihood of a genuine [governmental] interest . . . ." (alteration in original) (internal quotation marks and citation omitted)). Moreover, as the Supreme Court noted in *Citizens United*, the First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others."[6] 558 U.S. at 340.

The Commission's remaining interests—combating fraud and promoting charities—are equally unpersuasive. Similar to the Commission's interest in regulating gambling, the Commission has failed to explain how its interests in combating fraud and promoting charities are furthered by infringing on the

---

[6] The Commission has not articulated a compelling reason justifying the differential treatment of bingo operators and dog and horse racetrack operators. To the contrary, the Commission merely has recounted the history of gambling in Texas. While the development of gambling *may* demonstrate differing regulatory schemes governing bingo gaming as opposed to dog and horse racetracks, it fails to explain why one group's political speech is constrained but the other group's political speech is not.

Charities' political speech. The Commission's supposition that Texans are defrauded when Charities allocate a portion of their bingo proceeds to political advocacy is unfounded. Further, the Supreme Court previously has found such paternalistic justifications unavailing. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790–91 (1988) ("The State's remaining justification— the paternalistic premise that charities' speech must be regulated for their own benefit—is equally unsound. The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." (collecting citations)).

Even assuming that the Commission's interests are compelling, the challenged provisions are not narrowly tailored to achieve those ends. A law is narrowly tailored if it "actually advances the state's interest . . . , does not sweep too broadly . . . , does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc) (citations omitted).

There are a myriad of alternatives available to the Commission to assist it in regulating the gambling industry, combating fraud, and promoting charities. *See, e.g., Greater New Orleans Broad.*, 527 U.S. at 192 (suggesting nonspeech alternatives for curtailing gambling). Any possibility of fraud could be easily addressed by imposing public disclosure requirements on charities. *See, e.g., Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637– 38 (1980) (reasoning that "promot[ing] disclosure of the finances of charitable organizations also may assist in preventing fraud by informing the public of the ways in which their contributions will be employed"). As for the Commission's interest in promoting charities by ensuring that bingo proceeds are spent on charitable purposes, the Bingo Act already mandates that bingo

proceeds be used in furtherance of the Charities' charitable purposes. Tex. Occ. Code Ann. § 2001.454 ("A licensed authorized organization shall devote to the charitable purposes of the organization its net proceeds of bingo and any rental of premises.").

Accordingly, the political advocacy restrictions in the Bingo Act do not withstand strict scrutiny. Not only has the Commission failed to articulate a compelling interest justifying the challenged provisions, but even if we were to accept the interests raised by the Commission as compelling, the restrictions are not narrowly tailored. Consequently, the provisions at issue are facially invalid under the First Amendment.

## IV. CONCLUSION

Accordingly, we affirm the district court's permanent injunction and summary judgment.

No. 11-50932

JAMES L. DENNIS, Circuit Judge, joined by DeMOSS and GRAVES, Circuit Judges, dissenting:

Although I am in sympathy with the majority's desire to promote strong First Amendment protection of political speech, in my view, the Supreme Court's decisions in *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009), *Davenport v. Washington Education Association*, 551 U.S. 177 (2007), and *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), do not permit us to apply strict or heightened scrutiny necessary for us to strike down the particular type of alleged speech restriction at issue in this case.

*Ysursa* involved Idaho laws under which government employees were given the option of having the government, as their employer, deduct a portion of their wages to pay their union dues. Government employees, however, were not allowed to have the government deduct a portion of their wages to remit to the union's political action committee. Unions representing Idaho public employees challenged this limitation as a violation of their First Amendment rights. The Supreme Court rejected the challenge because, the Court explained, while the First Amendment operates as a negative restraint to forbid the government from "abridging the freedom of speech," the amendment "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression." 555 U.S. at 355. The Court elaborated:

> While publicly administered payroll deductions
> for political purposes can enhance the unions' exercise
> of First Amendment rights, Idaho is under no
> obligation to aid the unions in their political activities.
> And the State's decision not to do so is not an

21

abridgment of the unions' speech; they are free to engage in such speech as they see fit. They simply are barred from enlisting the State in support of that endeavor.

*Id.* at 359. The challenged Idaho laws did not "restrict political speech," the Court concluded, but merely "decline[d] to promote that speech by allowing public employee checkoffs for political activities." *Id.* at 355. Thus, because the state did "not infringe[] the unions' First Amendment rights," the Court held that the challenged laws were subject to only "deferential" "rational basis" review. *Id.* at 359, 362.

In *Ysursa*, the Court relied on its prior decision in *Davenport*, stating that it "guides our resolution here." *Id.* at 360. In *Davenport*, the Court addressed Washington state laws under which unions of government employees were authorized to levy "agency fees" on employees who were not union members but were nevertheless benefited by the union's collective bargaining. The union was not allowed, however, to spend such fees on political speech unless "affirmatively authorized" by the person from whom the fee was recovered. 551 U.S. at 182 (quoting statute). That "affirmative authorization" restriction was at issue. The Court upheld the challenged statute, "recogniz[ing]," as the *Ysursa* Court explained, "that the statute, rather than suppressing union speech, simply declined to assist that speech by granting the unions the right to charge agency fees for election activities." *Ysursa*, 555 U.S. at 361 (citing *Davenport*, 551 U.S. at 188-90).

Third is *Regan*, on which both *Ysursa* and *Davenport* relied. There, the Court upheld the federal tax code's refusal to provide certain tax benefits for

political lobbying, explaining that, "Congress has not infringed any First Amendment rights or regulated any First Amendment activity," but has "simply chosen not to pay for . . . lobbying." 461 U.S. at 546. In *Ysursa*, the Court stated that the government's "decision not to assist fundraising" "is simply not the same as directly limiting expression" and cited *Regan* in support of the distinction. *Ysursa*, 555 U.S. at 360 n.2 (citing *Regan*, 461 U.S. at 550). And in *Davenport*, the Court cited *Regan* for the proposition that the First Amendment "does not require the government to enhance a person's ability to speak." *Davenport*, 551 U.S. at 190.

It appears to me that the Texas charitable bingo program is analogous to the circumstances addressed in *Ysursa*, *Davenport*, and *Regan*. The charitable bingo program should not be considered in a void, but rather in its proper context. *Cf. ante*, at 16 (calling the argument that charitable bingo does not burden political speech "dubious at best" because the statute's text is "targeted at political speech"). We start from the contextual premise that, as a matter of law, gambling, including bingo, "implicates no constitutionally protected right" and rather "falls into a category of 'vice' activity that could be, and frequently has been, banned altogether." *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993); *see also There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*, 19 F.3d 1165, 1167 (7th Cir. 1994) ("Gambling has traditionally been closely regulated or even forbidden, without anyone suspecting that these restrictions violate the first amendment."). And as a matter of contextual fact, in Texas, bingo and other gambling has been prohibited for most of the state's history.

It was not until 1980 that Texas voters amended the state constitution to allow charitable bingo as an exception to the general prohibition on

gambling, *see* TEX. CONST. art. III, § 47, and not until 1981 that the legislature enacted the Bingo Enabling Act, *see* TEX. OCC. CODE § 2001.001 *et seq.*, which allows bingo to operate in the state in only very limited circumstances.  Under the Act, only specified categories of religious and nonprofit organizations (certain "religious societies," "nonprofit organizations whose predominant activities are for the support of medical research or treatment programs," "fraternal organizations," "veterans organizations," "volunteer fire departments," and "volunteer emergency medical services providers") are allowed, if licensed, to host bingo games on condition that they use their bingo proceeds to support the "charitable purposes" of the organization.  *Id.* §§ 2001.101, 2001.454.  They are not, however, permitted to use their bingo proceeds, but they may use any *other* funds, to "support or oppose a measure submitted to a vote of the people" or to "influence or attempt to influence legislation."  *Id.* § 2001.456.[1]

The 1981 charitable bingo program represents a legislative judgment that, although the longstanding general prohibition on gambling should stand, the social costs that support the suppression of gambling are outweighed in limited circumstances.  That is, regulated bingo should be permitted, the legislature decided, if it means that health clinics for the poor have more funds for medical services, that volunteer fire departments have more funds to protect their communities, etc.  The charitable bingo program is, in essence, a legislative effort at promoting those aims, which the legislature has identified as sufficiently worthy to warrant an exception to the gambling ban.

---

[1] Texas law also prohibits charitable bingo licensees from using their bingo proceeds to "support or oppose a candidate or slate of candidates for public office," but the plaintiffs-appellees here do not challenge that restriction.

No. 11-50932

Viewed in such light, it appears, under the reasoning of *Ysursa*, *Davenport*, and *Regan*, that the charitable bingo program's limitation against the use of bingo proceeds for lobbying and other political speech, which the legislature has decided *not* to promote, does not "suppress" that speech, thus subjecting the statute to strict or heightened scrutiny under the First Amendment.  Pre-1981, before the charitable bingo program was created, the appellees here could use their general funds for any political advocacy they desired.  The creation of charitable bingo in 1981 did nothing to change that. Today, with the charitable bingo program in place, the appellees remain equally free to use their general funds for any political advocacy they desire. They are only restricted from using their new, post-1981 charitable bingo proceeds, which they were previously prohibited from obtaining, for political advocacy.  In other words, the appellees' only grievance with the charitable bingo program that Texas created in 1981 is that it does not "assist [them] in funding the expression of [certain political speech]."  *Ysursa*, 555 U.S. at 358. But, as the Supreme Court has said, the First Amendment "does not require the government to enhance a person's ability to speak."  *Davenport*, 551 U.S. at 190 (citing *Regan*, 461 U.S. at 549-50).

Therefore, under the reasoning of *Ysursa, Davenport,* and *Regan,* I respectfully dissent from the majority's striking down the challenged parts of the Texas charitable bingo program under strict or heightened scrutiny.

No. 11-50932

JAMES E. GRAVES, Circuit Judge, joined by DeMOSS and DENNIS, Circuit Judges, dissenting.

I fully join Judge Dennis in dissenting from the majority opinion, which strikes down the challenged parts of the Texas charitable bingo program under strict scrutiny. However I write separately to address the majority's holdings that the Bingo Act does not create a subsidy and that the unconstitutional conditions doctrine applies in this case.

The Texas Constitution bans gambling. However, in 1980, Texas voters approved an amendment establishing an exception for charitable bingo. The Texas Bingo Enabling Act, passed in 1981, allows qualifying Texas charities to obtain a license to hold bingo games so long as all proceeds are spent in Texas and used for charitable purposes. The Act prohibits the use of bingo proceeds to support or oppose political candidates, to support or oppose ballot measures, or for lobbying. However, charities are not prohibited from using their own money for these purposes.

The Charities brought a facial challenge of the Act, asserting that the restrictions violate their First Amendment rights to free speech. The district court agreed and granted summary judgment for the charities. The district court also granted an injunction preventing enforcement of the challenged provisions. A panel of this court reversed the district court. On en banc rehearing, the majority now affirms the district court's permanent injunction and summary judgment. In affirming the district court, the majority concludes that the Bingo Act does not provide a subsidy to the Charities and that it includes unconstitutional conditions. I disagree.

In general terms, "the unconstitutional-conditions doctrine examines the extent to which government benefits may be conditioned or distributed in ways

26

that burden constitutional rights or principles." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 286 (5th Cir. 2005). One of the most frequently cited cases discussing the doctrine is *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). That case involved a claim by a professor at a state university alleging that his right to free speech was violated because he was discharged for publicly criticizing the university's administrative policies. *Id.* at 594–96. The Court held that the denial of a government benefit (a teaching position) cannot be predicated on the exercise of a constitutional right.

However, the Supreme Court has also held that when the government provides a subsidy it is entitled to define the parameters of the subsidized program, even if that means excluding certain types of speech. The Supreme Court explained this principle in *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In *Rust*, the Court held that that the unconstitutional conditions doctrine did not apply because "the Government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized. The ... regulations do not force the ... grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from [program] activities." *Id.* at 196. Responding to the service providers' argument that the speech restrictions constituted impermissible viewpoint discrimination, the Court expounded on the concept that government may subsidize certain activities and not others:

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not

discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of another. *A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right. A refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty on that activity.* There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.

*Id.* at 193 (emphasis added) (internal quotations and citations omitted).

The Court also applied this principle in *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), which involved restrictions similar to those at issue here. In *Regan,* the Court held that the statute prohibiting tax exemptions for organizations whose activities include a substantial amount of lobbying did not violate the unconstitutional conditions doctrine. Specifically, the Court noted that the plaintiff remained free to exercise its speech rights (lobby) outside the scope of the government tax exemption program. *Id.* at 544–45. The Court equated the tax exemption to a government subsidy and held that the restrictions were simply a choice by the government not to subsidize lobbying. *Id.* at 544, 545–46. The Court made clear that the government's decision not to subsidize the exercise of a constitutional right does not equate to a penalty on the right. *See id.* at 546 ("Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for [plaintiff's] lobbying."); *id.* at 549 ("We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right...."); *see also United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210–12, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (rejecting an argument that libraries' speech rights were violated by requiring that they

restrict internet access in order to receive a federal subsidy because "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity" (quoting *Rust*, 500 U.S. at 193)).

The Charities argue, and the majority agrees, that the State's charitable bingo program cannot be construed as a subsidy because it is implemented by means of a licensing scheme instead of cash payments or tax exemptions. The majority concludes that *Rust* and *Regan* are distinguishable because "no public monies or 'spending' by the state are involved" in the bingo program in Texas. (Maj. Op. at 316-318). I disagree, as these arguments place form over substance. In creating the charitable bingo program, the State established a narrow exception to the State's ban on bingo in order to allow a limited group of charities to conduct bingo games, free of competition, to generate extra revenue. As the Texas Constitution makes clear, this extra revenue is authorized to the limited extent that it is used for the charitable purposes of the organization. *See* Tex. Const. art. III, § 47(b). That this supplemental income stream is accessible by way of a license, instead of cash payments or a tax exemption, does not change the fact that the bingo program constitutes a government subsidy for participating charities. Notwithstanding the existence of this income stream, the State also spends money to run the program, as discussed more fully below.

The majority says that the Commission "contorts the definition of 'subsidy'" and cites Black's Law Dictionary before concluding that "[t]here is no direct or indirect receipt of funds from the public fisc." (Maj. Op. at lines 319-20, 331-32). However, the definition quoted by the majority does not include any such statement requiring "direct or indirect receipt of funds from the public fisc." (Maj. Op. at lines 321-223). The definition merely says a

"grant, made by the government, to any enterprise whose promotion is considered to be in the public interest." Black's Law Dictionary 1565 (9th ed. 2009). The majority then concedes that there is, in fact, a grant by the government here, i.e., "the legislative authority to conduct what would be illegal otherwise – bingo games." (Maj. Op. at lines 332-333). The majority also concedes that the bingo program involves public monies and spending by the state. Specifically, the bingo program requires Texas to spend money not only on licensing, but also to essentially run a "law enforcement agency" and regulate "all bingo-related activities, including the types of games played, game frequency and times, and bingo-employee qualifications." (Maj. Op. at 361, 363-364).

While some of these are regulatory costs, the majority cites no controlling authority for its conclusion that a bingo program is a regulatory scheme, which is akin to an occupational license and, thus, cannot be a subsidy. The majority cites a district court case from Virginia for the statement that, "simply because both subsidies and licenses enure a benefit does not mean they are one and the same. . . . [The government] may not use its regulatory powers to influence or penalize speech." *Satellite Broad. & Commc'ns Ass'n of Am. v. FCC*, 146 F. Supp. 2d 803, 830 (E.D. Va. 2001), *aff'd*, 275 F.3d 337 (4th Cir. 2001). Notably, the Fourth Circuit found it unnecessary to address the argument of whether the statutory copyright license should be seen as a targeted government subsidy because they found that the rule in question was consistent with the First Amendment. *Satellite Broad. & Commc'ns Ass'n of Am.*, 275 F.3d at 355, n.6.

There are, of course, many significant distinctions between a commercial occupational license and a state charitable gaming program, created by the

state constitution, that allows select charities to raise extra money through a gambling activity on the condition the money is used for the organizations' charitable purpose. Thus, under the definition of "subsidy" and the applicable case law of *Rust* and *Regan*, the government may attach speech restrictions to the bingo funds. *See also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009); *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177 (2007).

The Charities and the district court relied on *Citizens United,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), to support the conclusion that the challenged provisions are facially unconstitutional under the First Amendment because they burden political speech. But, *Citizens United* is distinguishable in two key respects. *Citizens United* involved a challenge to a federal statute prohibiting corporations from making expenditures for speech relating to federal elections. *Id.* at 320-21. Unlike this case, *Citizens United* did not involve speech restrictions in the context of a government subsidy. Here, the State has created a subsidy program where select charities are permitted to engage in a gambling activity in order to raise extra money for their charitable causes. As a condition of participating in the program, and receiving the extra money, the state requires that the money not be used for political advocacy. This requirement does not penalize political speech; it simply represents a decision by the State not to subsidize that activity. *See Rust*, 500 U.S. at 193 ("A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." (quoting *Regan*, 461 U.S. at 549)); *see also Am. Library Ass'n*, 539 U.S. at 211–12.

*Citizens United* is also distinguishable in that it involved a statute that imposed an "outright ban" on specific types of political speech. *Citizens United*, 130 U.S. at 337. In other words, the restrictions in *Citizens United* completely

No. 11-50932

foreclosed any way for corporations to engage in the prohibited political speech. *Id.* However, the provisions at issue in this case only prohibit the use of bingo proceeds for political advocacy and, therefore, only restrict speech within the scope of the State's charitable bingo program. As explained in *Rust*, the unconstitutional conditions doctrine is implicated when government requires, as a condition of participating in a government program, that the participant not exercise a constitutional right outside the scope of the program. *See Rust*, 500 U.S. at 197 ("[O]ur 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."); *see also Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, No. 12–10, 570 U.S. ----, 133 S.Ct. 2321, 2328–31, 186 L.Ed.2d 398 (2013) (reaffirming this principle). The Bingo Act's political advocacy restrictions fall within the government's power to subsidize some activities to the exclusion of others and therefore do not penalize political speech. As the Charities are not prohibited from engaging in lobbying or political speech outside the scope of the bingo program, the unconstitutional conditions doctrine is not implicated here.

Moreover, even if the unconstitutional conditions doctrine was implicated here, as Judge Dennis says, strict scrutiny is not appropriate. Rather, the Commission would merely have to establish, at the very most, a substantial state interest to justify the challenged provisions.[1] The majority concedes that the Supreme Court has recognized the Commission's first

---

[1] I am not suggesting that intermediate scrutiny applies.

32

No. 11-50932

interest of regulating gambling as a substantial state interest. *See Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 185-86 (1999). (Maj. Op. at 465-468).[2]

For the reasons stated herein, the challenged provisions in this case do nothing to restrict speech outside the scope of the State's bingo program. Charities are free to participate in the bingo program and to engage in political advocacy; they simply must not use bingo proceeds to do so. The Bingo Act's restrictions on the use of bingo proceeds for political advocacy are permissible conditions on a government subsidy and do not operate to penalize speech. Thus, I respectfully dissent.

---

[2] The majority takes issue with Texas' interest in regulating gambling based on the ability of horse and dog racetrack operators being able to engage in "unfettered political advocacy." (Maj. Op. at 479). Despite the fact that Charities also enjoy a nonprofit or charity, if you will, status and the ability to conduct bingo games unavailable to for-profit horse and dog racetrack operators, the Charities are able to engage in "unfettered political advocacy" with their own money.